EQUITY FIRE & CASUALTY COMPANY *v.*
Laurence TRAVER

96-1220                                           953 S.W.2d 565

Supreme Court of Arkansas
Opinion delivered October 9, 1997

*Horne, Hollingsworth & Parker*, by: *Cyril Hollingsworth*, for appellant.

*Hobbs, Garnett, Naramore & Strause, P.A.*, by: *Ronald G. Naramore*, for appellee.

W.H. "Dub" Arnold, Chief Justice. This case was certified to this Court from the court of appeals pursuant to Ark. Sup. Ct. R. 1-2(17)(d)(2) as a case of significant public interest involving a legal issue of major importance. This case involves the renewal of an insurance contract; specifically, we must address the issue of what constitutes an acceptance of a renewal notice for an insurance contract. Appellee, Traver, urges this court to adopt the postal-acceptance rule by holding that an insured accepts a renewal offer by placing a renewal premium payment in the mail. Appellant, Equity, contends that the plain language of the policy requires actual receipt of the payment, so the mailbox rule is not applicable.

Traver was involved in an automobile accident on March 19, 1994. The other party involved in the accident filed a claim with his insurance carrier; after payment of that claim, the insurance carrier filed a subrogation action against Traver. Traver then filed a third-party action against his insurance carrier Equity pursuant to a non-standard automobile policy contract.

Equity denied coverage of the accident claiming that Traver's policy was not in effect on the date of the accident. Specifically, Equity contended that the original policy had lapsed on March 14, 1994.

Traver received a renewal notice from Equity giving the due date of the renewal as March 9, 1994. The expiration date of the policy was March 14, 1994. Traver included a check and a hand-written note stating he had lost the renewal form in an envelope addressed to his local Hot Springs insurance agent, Roberson and Associates. He gave the envelope to his mother who mailed it from a mail drop-off in the Hot Springs mall to the Hot Springs

agent on March 11, 1994. The envelope was postmarked March 12, 1994; it was postmarked a second time with March 21, 1994.

The local agent did not receive the envelope until March 22, 1994; the agent forwarded the payment to Equity which received it on March 25, 1994. Equity accepted the check and reinstated the policy effective March 22, 1994. This gave a seven day period between March 14, the expiration date of the policy, and March 22, the new policy effective date, when Traver was not insured.

The Equity document entitled "YOUR PLAIN LAN-GUAGE CAR POLICY" was entered into evidence. Its "Renewal Provisions" section is as follows:

> We won't refuse to renew this policy solely because of your age, sex, marital status, residence, race, color, creed, national origin, ancestry or occupation. Subject to our consent you may renew this policy. When we consent to renew this policy, you must pay the renewal premium in advance. We will mail you a notice telling you when your premium must be paid. Your policy will expire if we don't receive the required payment by the renewal date.

The original policy listed the term from September 14, 1993, until March 14, 1994. An Equity employee, Tammy Warrier, testified that it was Equity's policy to extend renewal offers every six months. The renewal offer issued to Traver listed a due date of March 9, 1994. According to Ms. Warrier, the March 9, 1994, due date was an arbitrary date selected by the company to give the customer enough time to mail the payment before the expiration date. She indicated that company policy provides that "to renew a policy, the proper down payment must be postmarked by the U.S. Postal Service on or before the due date." Ms. Warrier explained that company policy was such that if the payment was postmarked before the arbitrary March 9, 1994, due date, but received late, even later than the March 14, 1994, expiration date, the company would have used the postmarked date and renewed the policy effective March 14, 1994. Conversely, if the postmark was before the expiration date, but after the due date, no such leniency would be given to a customer.

The trial court ruled that Traver's timely deposit in the United States mail of his renewal premium before the due date March 14, 1994, was an effective renewal and that the policy was in effect continuously, with no lapse. The trial court noted that there was no legal authority for this ruling, yet determined that the public policy of the State of Arkansas weighs heavily against forfeiture, so a timely deposit of a renewal premium in the U.S. mail, in the absence of fraud or deceit, constitutes an effective acceptance of the policy.

There is no Arkansas case directly addressing this issue. In *Kempner v. Cohn*, 47 Ark. 519, 1 S.W. 869 (1886), we recognized the mailbox rule for the acceptance of a contract. Once an offer has been made, a contract is completed when the acceptance is mailed if the acceptance is made in a reasonable amount of time. If a letter of withdrawal is mailed, before the mailing of the acceptance, it is effective only if the party to whom the offer was made receives the withdrawal before making the acceptance. *Id.*

Despite the fact that this case was decided in the 1800s, there are few cases following it which expound upon this theory. The *Kempner* decision has been followed as a routine matter of contract theory, with the proviso that parties are free to dictate the terms of offers and acceptances as they deem necessary.

In *Michelsen v. Patterson*, 9 Ark. App. 275 (1983), the court of appeals addressed a situation where a tenant mailed his rent on December 31, 1981, and it was received by the owner on January 2, 1982. The rent was due on January 1, 1982, and this day was a legal holiday. The owner refused the payment, and the tenant sought a court order deeming the payment timely under the mailbox acceptance rule. The court of appeals determined that the express language of a contract making time of the essence can eliminate the application of the mailbox acceptance rule. While there was no express language in the contract between the two parties, the tenant had received two letters during the year in which the owner indicated that no late payments for rent would be accepted and notified the tenant that strict adherence to all terms of the agreement was expected. The court of appeals found that these two correspondences were enough to put the tenant on

notice that time was of the essence and a delay in receiving the payment was a breach of the contract. The court of appeals affirmed the finding that the payment was not timely; however, this decision was limited to the particular facts of the case.

In the case before us, the policy language requires actual receipt of a premium payment prior to the expiration date of the policy to constitute acceptance of a renewal offer. The actual renewal notice gave the due date as a date five days before the expiration date. It does not contain the language requiring actual receipt of the premium payment; it instructs the insured to pay the amount listed as due in order to renew the policy.

In *Farmers Insurance Company of Arkansas v. J. W. Hall*, 263 Ark. 734, 567 S.W.2d 296 (1978), a dispute arose when an insured mailed his premium payment approximately seven days after the expiration date. The insured was involved in an accident several hours after mailing his insurance premium payment. Upon attempting to collect from the insurance carrier, the insurer refused coverage claiming that the policy had lapsed and was not in effect. The trial court ruled that Arkansas statutes that required notice before cancellation of an insurance policy precluded the policy from lapsing. We reversed holding that notice is not required when an insurance contract is for a specified term.

The outcome of *Hall, supra*, is not particularly helpful to the case at bar; however, the decision does provide insight into the manner in which these term policies have been interpreted in the past. In *Hall*, we classified the renewal notice as an offer to renew the policy which the insured could either accept or reject. The expiration date was the date that the offer expired by the terms on the face of the offer. Failure by the insured to accept the offer before the expiration of the term it was held open caused the policy to expire by its own terms; thus, the offer expires, and there is technically no cancellation. *Id*. at 737.

In *Hall*, we classified a renewal notice as an offer and the payment of the renewal premium as acceptance; however, the issue of what constitutes acceptance was not addressed. By utilizing the *Hall* analysis, Equity made an offer of renewal when it sent the notice of renewal. The offer, by its terms was open until the

underlying policy expired on March 14, 1994. Traver was free to accept or reject the offer up until that date by paying the premium. As evidenced by the language of the policy, Equity does not intend to be bound by acceptance of the contract until actual receipt of the premium; however, the language of the renewal notice does not require such receipt.

Equity relies upon 43 AM. JUR. 2d *Insurance* §447 as controlling the situation at bar. Specifically, this section states: "Where a policy makes the advance payment of the premium a condition for renewal, such payment must be made in advance to effect a renewal of the policy." This particular passage quotes the Arkansas case, *Hall*, discussed *supra*. However, it does little to render a solution to the actual issue here. There is no dispute that the payment of the premium was a condition precedent for acceptance; the question is at what point was the acceptance made, upon placing payment it in the mail or upon its receipt by the insurer?

Traver relies on a passage from AM. JUR. 2d which states:

> Under insurance policies providing that payment of premiums shall be made at a certain place by a certain time under penalty of forfeiture, where the insurer requests, authorizes, or acquiesces in the sending of the premiums by mail, a deposit thereof in the mail, properly addressed, and in time, according to the usual course of the mail, to reach the prescribed place by the time it is due, will prevent a forfeiture, even though it does not in fact reach its destination at all, or until after the date when due, and this notwithstanding that time is regarded as the essence in the contract.

43 AM. JUR. 2d *Insurance* §909 (emphasis supplied). This section then cites cases from various jurisdictions that follow this theory. However, this section is not particularly helpful because we are not dealing with an instance of mere payment on an existing insurance contract. Absent an existing insurance contract, there is no contractual right to be forfeited; therefore, the equitable rule weighing against forfeitures is not controlling.

In *Mississippi Insurance Underwriting Association v. Maenza*, 413 So.2d 1384 (Miss. 1982), the Mississippi Supreme Court examined a situation closely analogous to the case at bar. A prop-

erty and casualty policy renewal notice/offer was sent to the insured with an expiration date of September 10, 1979. The insured mailed payment on September 8, 1979, but it was not received by the insurer until September 11, 1979. A hurricane destroyed the insured's property on September 11, 1979. The insurer accepted the payment, but claimed the policy had lapsed because payment was not received on or before the due date. The insurer then treated the payment as an application for new coverage and issued a policy with the effective date of September 14, 1979.

The insured brought a claim before the Mississippi Insurance Commission, and it rendered a ruling that the renewal was effective when the premium payment was deposited in the United States mail, as long as it was deposited in time to reach the insurer on or before the expiration date. The insurance commission determined that neither party was to blame for a delay within the postal service; however, the insurer was the party that should bear the imputed burden because it adopted the postal service as its agent when allowing premiums to be transported via mail. 413 So.2d at 1386.

The Mississippi Supreme Court affirmed the findings of the insurance commission. Specifically, that court held that the insurer's renewal notice is an offer that is accepted by the offeree/insured sending premium payments. The insurer in this instance required that payment be *received* before acceptance became effective; the Mississippi court rejected this notion because there was no clear language to suggest that acceptance was not effective until receipt. However, the court went on to conclude that in circumstances where an insurer invites premiums to be forwarded through the mail, it adopts the postal service as its agent and deposit of a payment with that agent constitutes acceptance of coverage. According to the Mississippi court, adopting the postal service as an agent imputed any negligence on their behalf to the insurer despite any contract language to the contrary; therefore contract language requiring receipt before acceptance was valid does not render the mailbox acceptance rule inapplicable. *Id.* at 1388.

In *Maenza*, the Mississippi court based the finding that the insurer invited the use of the postal service on several factors. First of all, the renewal notice itself indicated that payment could be made via mail, and the insurer utilized the mail to send the renewal notice. The insurer's office was over 100 miles from most of its insureds, so personal delivery would have been impractical. There are two other important factors to note in the *Maenza* decision. First, the payment was deposited with the postal service *prior* to the expiration date, in apt time to reach the insurer in a timely manner. Second, upon receipt of the payment it deemed late, the insurer made no attempt to refund the money, but caused a new policy to become into effect with a gap in the coverage.

In the case before us, Equity did have written language requiring receipt of the payment in order for acceptance to be effective; however, that language was in the policy and not on the actual renewal notice. Equity utilized the postal service as a carrier for its offer and expected to receive the acceptance via the mail. Traver mailed the premium payment in a timely manner where, absent negligence or mistake by the postal service, it had ample time to reach Equity prior to the termination date. Upon receipt of Traver's check, Equity did not refuse the payment, yet accepted it as an application for a new policy.

Based upon the facts of this case, it is our determination that Traver's placing the renewal premium in the mail in a timely manner constituted acceptance of Equity's renewal offer. Due to the peculiar factual scenario provided here, this holding is limited to the particular facts and circumstances of this case. We do not institute an absolute rule of applying the "mailbox rule" to all renewal premium payments, nor do we hold that parties are not free to dictate the terms of acceptance of offers. The facts before us present a unique situation where Traver was not afforded notice through the actual offer that receipt of payment was required before acceptance was effective. Given the fact that there was no fraud or negligence on behalf of Traver and the fact that Traver placed the payment in the mail with ample time for it to reach Equity prior to the expiration of the offer, we hold that in this instance there was a manifest acceptance of the renewal offer.

Therefore, Traver's policy did not lapse, and it was effective beginning on March 14, 1984.

Affirmed.

BROWN and IMBER, JJ., concur.

NEWBERN, J., dissents.

ROBERT L. BROWN, Justice, concurring. I concur in the result but do so for different reasons than those expressed in the majority opinion.

The instant case involves a renewal of insurance which is effected by an initial payment. There is no disagreement between the parties that the payment was made. There is also no disagreement that the premium was mailed by Traver to Equity Fire two days before the renewal date of March 14, 1994. Finally, it is clear that once the premium was received by the insurance agent on March 22, 1994, the policy was renewed, effective as of that date.

Equity Fire relies on this language in its policy to deny coverage between March 14 and March 22, 1994:

> "RENEWAL PROVISIONS"
> We won't refuse to renew this policy solely because of your age, sex, marital status, residence, race, color, creed, national origin, ancestry or occupation. Subject to our consent, you may renew this policy. When we consent to renew this policy, you must pay the renewal premium in advance. We will mail you a notice telling you when your premium must be paid. Your policy will expire if we don't receive the required payment by the renewal date.

This language is buried on page 19 of a 21-page insurance contract. In addition, Equity Fire sent out a "Renewal Offer" specifying a Due Date of March 9, 1994, which differed from the Renewal Date of March 14, 1994. The Renewal Offer did not state that the policy would expire if payment was not received by March 9 or March 14.[1]

---

[1] The terms of the actual Renewal Offer sent to Traver are unknown because that specific Renewal Offer was either not received by Traver or was misplaced.

Equity Fire, by practice, amended its insurance contract by adopting its own version of the mailbox rule. According to Ms. Tammy Warrier, who held the title of Supervisor for the carrier, the practice of her employer was to permit renewals when the premium was mailed before the due date (here, March 9, 1994) even though the premium was received long after the renewal date of March 14, 1994. Equity Fire's own mailbox rule regarding the due date clearly modified the insurance contract. The practice may have benefitted the insured to some extent, but it primarily benefitted Equity Fire by encouraging payment of premiums five days before the renewal date.

In short, Equity Fire's practice modified the insurance contract and resulted in an earlier payment of premiums than required by the insurance contract. Yet, Equity Fire refuses to acknowledge Traver's payment of his premium made two days before the renewal date and couches its refusal on contract language which the carrier itself did not follow in all instances.

Equity Fire's inconsistent treatment of the mailbox rule, depending on which party is benefitted, runs counter to sound public policy. Moreover, the fact that the insurance coverage would lapse absent receipt of the first payment by the renewal date was not made as clear as it could have been to Traver. That fact should have been highlighted on renewal notices and boldly printed in the insurance contract itself. It was not.

Like the majority, I am reluctant to adopt a mailbox rule across the board in all insurance cases. However, under the facts of this case, public policy dictates a decision in favor of the insured.

IMBER, J., joins.

DAVID NEWBERN, Justice, dissenting. The majority holds that Laurence Traver was covered on March 19, 1994, the date of his automobile accident, by a renewed policy of insurance issued by Equity Fire & Casualty Company ("Equity"). That holding is based upon the majority's conclusion that the "actual renewal notice" sent to Mr. Traver by Equity did not inform Mr. Traver of a requirement that the premium for renewal be received prior to expiration of the original policy.

The "actual renewal notice" was not in evidence. Mr. Traver introduced in evidence a letter he sent to Equity with his renewal premium explaining that he had lost his "renewal slip." Lea Fain, an employee of the insurance agent with whom Mr. Traver dealt, testified with respect to a "copy" of the notice received by the agent but stated it was not the same as the notice sent to Mr. Traver. While it is not clear from Ms. Fain's testimony, it may be that the only difference between the "copy" and the "actual" notice is some writing at the bottom of the "copy" concerning the "agent's binding date" about which she testified. At any rate, we cannot say what the "actual renewal notice" received by Mr. Traver contained.

The policy required that the renewal premium be "received" prior to the renewal date. According to the contract evidenced by the policy, there could have been no renewal prior to March 22, 1994, the date the premium was received by the company's agent. That is so unless we adopt a full-blown version of the mailbox rule and the fiction that the postal service is the agent of Equity. The majority is unwilling to go that far; thus it is relegated to consideration of the contract between the parties.

It is basic contract law that an offer which specifies a period of time for its duration terminates upon the lapse of the time specified. *Burnett v. Holiday Inns of America*, 239 Ark. 642, 391 S.W.2d 27 (1965). When the terms of an insurance-policy renewal offer are not met, there is no renewal. *Farmers Ins. Co. v. Hall*, 263 Ark. 734, 567 S.W.2d 296 (1978). Even if we rely upon the "copy" of the renewal offer and assume it is the same as that received by Mr. Traver, despite the testimony of the insurance agent's employee, we should reverse. The "copy" provided a "due date" of March 9, 1994. Whether acceptance was thus "due" at a mailbox or at the office of the insurer, it did not occur until March 12, 1994, at the earliest. Mr. Traver's deposit of the renewal acceptance in the mailbox on March 12, 1994, did not meet the contract terms of the policy or the terms, as best we can determine, of the renewal offer.

I respectfully dissent.